Receipt number AUSFCC-11463449

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

CLEAN ENERGY FUND OF TEXAS,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

Case No. 26-1354 C

**COMPLAINT**

**NATURE OF THE DISPUTE**

1. This case arises from the unlawful, unilateral termination of a binding grant agreement between Plaintiff, Clean Energy Fund of Texas, and the U.S. Environmental Protection Agency's ("EPA"), which was awarded under the Solar for All zero-emissions technologies program ("Grant Agreement"). The Grant Agreement gave rise to binding obligations between EPA and Clean Energy Fund of Texas. Clean Energy Fund of Texas seeks money damages resulting from EPA's breach of the Grant Agreement, EPA's violation of the Fifth Amendment's Due Process Clause (an illegal exaction) or, in the alternative, EPA's violation of that amendment's Takings Clause.

2. On July 17, 2024, EPA awarded Clean Energy Fund of Texas a $156,120,000 Solar for All grant. Under the Notice of Award, the grant became binding when Clean Energy Fund of Texas accepted the award by not filing a disagreement within 21 days.

3. Before EPA's abrupt breach of the Grant Agreement, EPA obligated $7 billion in grant funding that Congress appropriated to EPA to provide to states, territories, Tribal governments, municipalities, and nonprofits across the country to develop long-lasting solar

energy programs. Congress directed EPA to award these grant funds to enable low-income and disadvantaged communities to deploy and benefit from zero-emission technologies including distributed residential solar, which would lower energy costs for families, reduce the risk of utility shut offs, create good-quality jobs, advance environmental justice, and mitigate the effects of climate change.

4. EPA conducted a competitive review process, selected the grantees, obligated the grant funds, entered into agreements, and approved workplans for each grantee.

5. By November 14, 2024, Clean Energy Fund of Texas received its full grant amount in its Automated Standard Application for Payment ("ASAP") account, minus $400,000 that was awarded as an in-kind amount in grant support services. Clean Energy Fund of Texas began to perform under its Grant Agreement.

6. In July 2025, a subsequent Congress repealed large portions of the Greenhouse Gas Reduction Fund, but it did not retroactively repeal the Solar for All program.

7. That same Congress rescinded only "*unobligated* balances," thereby preserving all $7 billion in funding that EPA already had awarded and obligated through Solar for All grant agreements. One Big Beautiful Bill Act, Pub. L. 119-21, § 60002, 139 Stat. 72, 154 (July 4, 2025); *see also* Order on Cross-Motions for Summary Judgment at 5, *Ariz. v. EPA*, No. 2:25-cv-02015-TMC (W.D. Wa. June 1, 2026) (noting that "[c]onsistent with the text of the statute, the congressional record indicates legislators intended Section 60002 to only rescind unobligated balances and to leave alone any funds already distributed."). A true and exact copy of the Order on Cross-Motions for Summary Judgment is attached as Exhibit A.

8. Despite Congress's decision to rescind only unobligated balances and despite the fact that Solar for All grant funding obligated to Clean Energy Fund of Texas' Grant Agreement

was already disbursed into Clean Energy Fund of Texas' ASAP account and was unaffected by the repeal, EPA announced the cancellation of the Solar for All program on or about August 7, 2025.

9. EPA then unilaterally terminated Clean Energy Fund of Texas' Grant Agreement—a clear, unambiguous, and material breach of the agreement between EPA and Clean Energy Fund of Texas.

10. By August 12, 2025, EPA withdrew approximately 92 percent ($143,536,915.02) of the obligated and disbursed grant funds from Clean Energy Fund of Texas' ASAP account.

11. EPA's unilateral termination and withdrawal of obligated and disbursed funds breached the express terms of Clean Energy Fund of Texas' Grant Agreement, which permitted termination only in three narrow circumstances: (a) noncompliance that materially impairs performance; (b) adequate evidence of waste, fraud, or abuse; or (c) material misrepresentations of eligibility status. None of these circumstances occurred, nor has the EPA ever made such claims against Clean Energy Fund of Texas.

12. EPA's actions interfered with Clean Energy Fund of Texas' performance under the Grant Agreement and destroyed Plaintiff's reasonable expectations regarding the fruits of its Grant Agreement.

13. EPA purportedly acted based on its misguided understanding of the One Big Beautiful Bill Act ("H.R. 1"), which repealed Section 134 of the Clean Air Act and rescinded only "the *unobligated* balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act)." Pub. L. 119-21, § 60002, 139 Stat. 72, 154 (July 4, 2025) (emphasis added). Because EPA had fully obligated the Solar for All funds awarded to Clean

Energy Fund of Texas well before the enactment of H.R. 1, those funds were not "unobligated" on the day before enactment of H.R. 1 and therefore were not rescinded by that Act.

14. Consistent with the statutory text, the Congressional Budget Office ("CBO") calculated that § 60002 of H.R. 1 would rescind only approximately $19 million—representing the remaining unobligated funds set aside for EPA's administrative costs. CBO, *Estimated Budgetary Effects of Public Law 119-21, to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Relative to CBO's January 2025 Baseline* (July 21, 2025), https://www.cbo.gov/publication/61570 (Excel spreadsheet) (select "view document" and select tab "Title VI." View row 21 and column O). *See* Ex. A, Order on Cross-Motions for Summary Judgment at 5-6, *Ariz. v. EPA*, No. 2:25-cv-02015-TMC (listing the CBO's finding of savings of $19 million, "rather than billions of dollars in already-issued grants," as support for finding that "the congressional record indicates legislators intended Section 60002 to rescind *unobligated* balances and to leave alone any funds already distributed"). Notwithstanding the rescission of these funds, EPA had other appropriations available and continued to administer the Solar for All program for weeks after H.R. 1 became law.

15. On March 15, 2025, the 119th Congress (2025-2026) passed a continuing resolution that appropriated $3,195,028,000 for the "Environmental Protection Agency—Environmental Programs and Management" for the 2025 fiscal year. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, § 1802(3), 139 Stat. 9, 30 (Mar. 15, 2025). These funds remained available for the EPA to carry out its work, including the administration of lawfully awarded grants, such as Clean Energy Fund of Texas' Grant Agreement.

16. In its August 2025 Termination Memorandum, EPA asserted that § 60002 of H.R. 1 repealed the statutory authority for the Solar for All program and eliminated *all* appropriations

necessary to continue administering Solar for All awards, including Plaintiff's. EPA stated that, because Congress had repealed Section 134 of the Clean Air Act and rescinded appropriations "to carry out" that section, the agency no longer possessed any legal authority or funding to oversee, monitor, or implement existing Solar for All grants. EPA represented that this perceived loss of statutory authority and appropriations required it to terminate Plaintiff's Grant Agreement.

17. EPA's position is erroneous as a matter of statutory interpretation and equally erroneous as a matter of contract law: EPA's interpretation of H.R. 1 does not constitute a permissible ground for termination under the express terms and conditions of the Grant Agreement.

18. By unilaterally cancelling the Grant Agreement without any legally sound justification and seizing the awarded funds from Clean Energy Fund of Texas, EPA breached the express terms of the Grant Agreement and violated the covenant of good faith and fair dealing.

19. Clean Energy Fund of Texas files this suit to recover money damages for EPA's breach of the Grant Agreement. Additionally, Clean Energy Fund of Texas seeks to recover obligated funds improperly seized from Clean Energy Fund of Texas's ASAP account as an illegal exaction. In the alternative, Clean Energy Fund of Texas seeks just compensation for EPA's unconstitutional taking of funds from Clean Energy Fund of Texas's ASAP account in violation of the Fifth Amendment to the U.S. Constitution.

## JURISDICTION

20. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(a)(1) (the "Tucker Act") because the claims against the United States are founded upon a binding agreement with the United States.[1] *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2662 (2025) (Barrett, J., concurring) ("plaintiffs' challenges to the grant terminations belong in the [Court of Federal Claims]"). The Tucker Act also provides jurisdiction over illegal exaction actions where a plaintiff seeks to "recover the sums exacted illegally . . . due to [the government's] misinterpretation or misapplication of statutes, regulations or forms." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1578 (Fed. Cir. 1996); *Northern Cal. Power Agency v. United States,* 122 Fed. Cl. 111, 115-17 (2015) ("Jurisdiction to recover an exaction is provided when the exaction is based on an asserted statutory power . . . .") (internal quotation marks omitted). Finally, the Tucker Act provides jurisdiction for takings claims under the Fifth Amendment. *Alpine PCS, Inc. v. United States*, 878 F.3d 1086, 1092 (Fed. Cir. 2018).

21. Clean Energy Fund of Texas does not seek either specific relief or reinstatement of the Grant Agreement, as such non-monetary claims fall within the jurisdiction of the federal district courts. *See Bowen v. Massachusetts*, 487 U.S. 879, 894–95 (1988).

[1] Clean Energy Fund of Texas files this action solely to seek money damages for Defendant's breach of the Solar for All Grant Agreement and does not waive any rights to challenge any agency action related to Solar for All in any other forum. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2660–62 (2025) (Barrett, J., concurring). Nothing in this pleading should be construed as a concession that all federal grants, including other Solar for All awards, constitute contracts for Tucker Act purposes, or that all challenges to the termination of such grants necessarily sound in contract or must be brought in this Court.

## PARTIES

### Plaintiff

22. Clean Energy Fund of Texas is a 501(c)(3) nonprofit organization headquartered in Houston, Texas. Clean Energy Fund of Texas is a mission-based community financial institution and green bank dedicated to making clean energy accessible to every community across Texas. Clean Energy Fund of Texas was created to serve Texans through affordable, low-interest financing, helping homeowners, businesses, and community organizations install green energy and energy efficiency solutions—from rooftop solar and heating and air-conditioning upgrades to lighting, insulation, and water-saving systems. Clean Energy Fund of Texas is the recipient of Grant Number ("FAIN") 84092501 from EPA.

### Defendant

23. Defendant is the United States of America, acting through the United States Environmental Protection Agency—an independent agency within the executive branch of the United States government—and its Administrator, Lee Zeldin. EPA is a party to the Grant Agreement at issue in this case.

## FACTUAL BACKGROUND

### Congress establishes the Greenhouse Gas Reduction Fund.

24. On August 16, 2022, the Inflation Reduction Act was signed into law. Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022).

25. One provision of the Inflation Reduction Act created a $27 billion "Greenhouse Gas Reduction Fund" by adding a new Section 134 to the Clean Air Act. *Id.* at 2065–66, *repealed by* Pub. L. No. 119-21, § 60002, 139 Stat. 72, 154 (July 4, 2025).

26. As part of the Greenhouse Gas Reduction Fund, Congress appropriated $7 billion for EPA to use to support "zero-emission technologies." Pub. L. No. 117-169, § 134(a)(1), 136 Stat. at 2066. Specifically, Congress directed EPA "to make grants, on a competitive basis . . . to States, municipalities, Tribal governments and eligible recipients for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential rooftops, and to carry out other greenhouse gas emission reduction activities." *Id.* Eligible recipients included nonprofit organizations, such as Plaintiff. *Id*. § 134(c)(1), 136 Stat. at 2067.

27. Congress thereby provided statutory authorization for EPA's authorized representatives to bind the United States in grant agreements created from the Greenhouse Gas Reduction Fund.

28. Congress appropriated this $7 billion for fiscal year 2022, directed that EPA begin making grants "not later than 180 calendar days after the date of enactment," which was August 16, 2022, and provided that the appropriated funds would "remain available until September 30, 2024." *Id.* § 134(a)(1), 136 Stat. at 2066. Thus, EPA had a 2-year period to award the funds that Congress had created.

29. Congress also appropriated $30 million to EPA—"[i]n addition to amounts otherwise available"—for the "administrative costs necessary to carry out activities under" the Greenhouse Gas Reduction Fund. *Id.* § 134(a)(4), 136 Stat. at 2066.

**EPA creates the Solar for All grant program.**

30. Beginning in October 2022, EPA undertook a months-long public stakeholder engagement process to inform its implementation of the Greenhouse Gas Reduction Fund

appropriations, including how to design its competitive grant programs. *See* Richard K. Lattanzio, Cong. Research Serv., IF12387, *EPA's Greenhouse Gas Reduction Fund (GGRF)* 1–2 (May 21, 2024), https://www.congress.gov/crs-product/IF12387.

31. On June 28, 2023, EPA published a Notice of Funding Opportunity ("NOFO") for the zero-emissions technology competitive grant program, which the agency called "Solar for All."

32. On August 31, 2023, in a revised NOFO, EPA extended the application deadline, adjusted award size requirements, and made other minor adjustments. *See* Env't Prot. Agency, *Revised Solar for All Notice of Funding Opportunity*, Funding Opportunity No. EPA-R-HQ-SFA-23-01 (Aug. 31, 2023), https://perma.cc/SC5J-7954. A true and exact copy of the Revised Solar for All NOFO is attached as Exhibit B.

33. The NOFO invited eligible applicants to apply for Solar for All awards—totaling approximately $7 billion—that would "advance the three overarching [Greenhouse Gas Reduction Fund] program objectives": (1) "Reduc[ing] emissions of greenhouse gases and other air pollutants"; (2) "Deliver[ing] benefits of greenhouse gas- and air pollution-reducing projects to American communities, particularly low-income and disadvantaged communities"; and (3) "Mobiliz[ing] financing and private capital to stimulate additional deployment of greenhouse gas- and air pollution-reducing projects." *Id.* at 6–7, 24.

34. To be eligible to apply to the Solar for All competition, applicants were required to submit Notices of Intent ("NOI") that described, among other things, the expected number of applications, the program locations, and the expected amount of funding requested. *Id.* at 18–20. Clean Energy Fund of Texas submitted its NOI as required on August 14, 2023. A true and exact copy of Plaintiff's NOI is attached as Exhibit C.

35. Each Solar for All application had to adhere to extensive requirements prescribed by EPA in the NOFO. Each applicant was asked to, among other things: provide a specific program narrative explaining "how you will develop and execute a robust and equitable program that enables the rapid deployment of distributed solar and associated storage with meaningful benefits to low-income and disadvantaged communities"; provide a program administrative narrative describing "how you will administer the grant program and demonstrate you have the policies, procedures, tools, and capabilities to successfully achieve the program goals"; and provide a reporting plan describing a "plan to execute against the grant's reporting requirements, including tracking and measuring progress in achieving expected environmental outputs and outcomes." Ex. B at 44–49.

36. The NOFO made clear that the competitive Solar for All grant awards were "designed to spur the deployment of residential distributed solar energy to lower energy bills for millions of Americans and catalyze transformation in markets serving low-income and disadvantaged communities." *Id.* at 5. The Solar for All grants were intended to help "transform the clean financing ecosystem in the United States, especially in low-income and disadvantaged communities" and "deliver on the climate and environmental justice goals of the United States." *Id.* As the NOFO recognized, "[p]er Section 134(a)(1) of the Clean Air Act, 100% of Solar for All funds must be deployed 'to enable low-income and disadvantaged communities to deploy or benefit from zero-emissions technologies.'" *Id.*

37. Applications for awards were to be submitted by October 12, 2023, at 11:59 p.m. *Id.* at 39. Clean Energy Fund of Texas submitted an application by this deadline. A true and exact copy of Clean Energy Fund of Texas' Solar for All application narrative is attached as Exhibit D.

38. After the Solar for All grant application period closed in October 2023, EPA commenced a rigorous, multi-stage application review process. According to EPA, "[t]his multi-stage process included review from hundreds of experts in climate, power markets, environmental justice, labor, and consumer protection" from across multiple agencies. Press Release, Env't Prot. Agency, *Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar, Saving Low-Income Americans $350 Million Annually and Advancing Environmental Justice Across America* (April 22, 2024), https://perma.cc/73B7-UEQF.

39. EPA evaluated each Solar for All application that met threshold eligibility criteria under a 245-point scoring system. Ex. B at 51. Points were assigned across the NOFO's required components, including the Program Strategy Narrative, which could receive up to 175 points based "on the quality and extent to which [each application] articulates a plan to use grant funds to advance [Greenhouse Gas Reduction Fund] program objectives." *Id.*

40. On April 22, 2024, EPA announced that it had selected 60 applicants to receive Solar for All grants, including "states, territories, Tribal governments, municipalities, and nonprofits." Press Release, Env't Prot. Agency, *Biden-Harris Administration Announces $7 Billion Solar for All Grants to Deliver Residential Solar, Saving Low-Income Americans $350 Million Annually and Advancing Environmental Justice Across America* (April 22, 2024), https://perma.cc/73B7-UEQF. Clean Energy Fund of Texas was among the Solar for All recipients.

41. Between April and July of 2024, EPA worked with Clean Energy Fund of Texas to finalize how it would operate its Solar for All program, which was memorialized in a Grant Agreement (hereinafter the "Initial Grant Agreement"). A true and exact copy of Clean Energy Fund of Texas' Initial Grant Agreement is attached as Exhibit E.

42. Under the Initial Grant Agreement, EPA awarded Clean Energy Fund of Texas a sum of money and informed it that "[t]he recipient demonstrates its commitment to carry out this award by either: 1) drawing down funds within 21 days after EPA award or amendment mailing date; or 2) not filing a notice of disagreement with the award terms and conditions within 21 days after EPA award or amendment mailing date." Ex. E at 1.

43. Clean Energy Fund of Texas also agreed to be subject to an array of administrative and programmatic requirements in implementing the Initial Grant Agreement. For example, Clean Energy Fund of Texas agreed to, among other things: submit performance reports and transaction-level and project level data, *id.* at 7–9; "implement this grant in accordance with its EPA-approved Solar for All Workplan," *id.* at 17; "only use the award to support . . . allowable activities" and "not use the award for . . . unallowable activities," *id.* at 18; and "ensure that 100% of the award is used for the purposes of enabling low-income and disadvantaged communities to deploy and benefit from eligible zero emissions technologies," *id*. at 19.

44. Clean Energy Fund of Texas' Initial Grant Agreement also contained a termination provision in the terms and conditions that reads:

> EPA maintains the right to terminate the assistance agreement only as specified in 2 CFR [§] 200.340, through either a partial or full termination. . . .

*Id.* at 30.

45. EPA entered into the Initial Grant Agreement pursuant to its statutory mandate to "make grants . . . for the purposes of providing grants, loans, or other forms of financial assistance, as well as technical assistance, to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, including distributed technologies on residential

rooftops, and to carry out other greenhouse gas emission reduction activities." Pub. L. No. 117-169, § 134(a)(1), 136 Stat. 1818, 2066.

46. The Initial Grant Agreement became binding on both parties "21 days after the EPA award . . . mailing date," by the recipient either "drawing down funds" or "not filing a notice of disagreement with the award terms and conditions." Ex. E at 1. The mailing date on Clean Energy Fund of Texas' Grant Agreement was July 17, 2024, so Clean Energy Fund of Texas' Initial Grant Agreement became binding on both parties by August 7, 2024. *Id.*

47. The Initial Grant Agreement was digitally signed by an EPA award official with authority to bind the United States. *Id.*

48. The Initial Grant Agreement anticipated that Plaintiff would spend time working with EPA to finalize program workplans and budgets before beginning to implement its program and funding projects in early 2025. *Id.* at 16–17.

49. Relying on the obligated award funds, Clean Energy Fund of Texas negotiated a workplan and proposed budget with EPA. The workplan process included identifying program areas for funding, detailing how funds would be allocated, and outlining terms and conditions. Until the workplan was approved, Clean Energy Fund of Texas was restricted to drawing down no more than 2% of its obligated funds for program administration to ensure that adequate funds would be available to carry out its authorized projects after the program launched. *See id.* at 16. A true and exact copy of Clean Energy Fund of Texas' Solar for All Work Plan is attached as Exhibit F.

50. On December 19, 2024—after Clean Energy Fund of Texas finalized its workplan and obtained EPA's approval—EPA issued an Assistance Amendment (hereinafter the "Amended Grant Agreement") that lifted the 2% funding restriction. The Amended Grant Agreement

authorized Clean Energy Fund of Texas to access the full amount of its obligated funds and begin implementing its program. A true and exact copy of Clean Energy Fund of Texas' Amended Grant Agreement is attached as Exhibit G.

51. Clean Energy Fund of Texas' Amended Grant Agreement contained an updated termination provision in the terms and conditions. The full termination provision in the Amended Grant Agreement reads:

> EPA maintains the right to terminate the Assistance Agreement **only as specified in** 2 CFR [§] 200.339 and the version of 2 CFR [§] 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions **is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status**, prompting adverse action by EPA per 2 CFR [§] 200.339, through either a partial or full termination. If EPA partially or fully terminates the Assistance Agreement, EPA must (1) de-obligate uncommitted funds and re-obligate them to another Eligible Recipient selected under Funding Opportunity Number 66.959 (Zero Emissions Technologies Grant Program, also known as Solar For All) to effectuate the objectives of Section 134 of the Clean Air Act, 42 USC § 7434 within 90 days of the de-obligation and (2) amend the Recipient's Assistance Agreement to reflect the reduced amount, based on the de-obligation. In accordance with 2 CFR 200.341, EPA will provide the Recipient notice of termination. If an Eligible Recipient has assumed a legal obligation properly incurred for an allowable activity entered into by a suspended or terminated Recipient, EPA will re- obligate funds to the Eligible Recipient to satisfy the legal obligation and accept an amended workplan and budget to that effect.

Ex. G at 36–37 (emphasis added).

52. On December 19, 2024, EPA mailed its Amended Grant Agreement to Clean Energy Fund of Texas. *See* Ex. G at 1. Under the terms of the Notice of Award, Clean Energy Fund of Texas' Amended Grant Agreement became binding no later than January 9, 2025—"21 days after the EPA award . . . mailing date"—either by the Plaintiff "drawing down funds" or "not filing a notice of disagreement with the award terms and conditions." Ex. G at 1.

53. Clean Energy Fund of Texas' Amended Grant Agreement was digitally signed by an EPA award official with authority to bind the United States. *Id.*

54. Through the first months of 2025, Clean Energy Fund of Texas continued to perform under the Grant Agreement. Clean Energy Fund of Texas continued to draw down funds under the Grant Agreements from its ASAP account.

55. On or about August 8, 2025, EPA withdrew or caused to be withdrawn $143,536,915.02 from Clean Energy Fund of Texas' ASAP account in connection with its Solar for All Grant Agreement. A true and exact copy of an Account Statement Inquiry for August 25, 2025, showing this withdrawal is attached as Exhibit H. This withdrawal reduced Clean Energy Fund of Texas' ASAP account balance from approximately $153,682,357.52 as of late August 7, 2025, to approximately $10,145,442.50 by August 12, 2025, representing the removal of about 92 percent of the grant funds previously obligated and disbursed to Clean Energy Fund of Texas. A true and exact copy of ASAP Account Profile Inquiries for August 7, 2025, and August 12, 2025, are attached as Exhibit I.

**Congress repeals Clean Air Act § 134 but rescinds only unobligated funds.**

56. On July 3, 2025, Congress passed a budget reconciliation bill, H.R. 1., Pub. L. 119-21, 139 Stat. 72 (July 4, 2025). Section 60002 of H.R. 1 provides:

> Section 134 of the Clean Air Act (42 U.S.C. [§] 7434) is repealed and the unobligated balances of amounts made available to carry out that section (as in effect on the day before the date of enactment of this Act) are rescinded.

139 Stat. at 154.

57. By its express terms, H.R. 1 rescinded only "the *unobligated* balances of amounts made available to carry out" section 134 of the Clean Air Act. *Id.* (emphasis added). Accordingly, any Greenhouse Gas Reduction Fund funds that *were* obligated as of July 3, 2025, were not

rescinded. Plaintiff's funds were obligated well before July 3, 2025, and were, therefore, not rescinded by H.R. 1.

58. Legislative history further underscores that H.R. 1 did not rescind any obligated funds and likewise did not end the Solar for All program created by those obligated funds.

59. During the markup of the Energy and Commerce Committee title on H.R. 1 on May 13, 2025, Representative Morgan Griffith (R-Va.), then-Chair of the House Energy and Commerce Committee's Subcommittee on the Environment, emphasized that H.R. 1 would not impact already obligated grants:

> [T]hese provisions that we are talking about only apply as far, as this bill is concerned, to the unobligated balances. So if a grant was already given, as far as this bill is concerned, then that would still be going forward . . . If the grant has already been granted and the money is obligated,. . . then our language does not affect that. . . .
>
> [W]e can't rescind expenditures that have already been obligated.

H. Comm. on Energy and Com., *Markup of Budget Reconciliation Text* (Part 1) at 244:5959-5970, (last updated August 15, 2025), https://perma.cc/PSS2-KE85.

60. Representative Brett Guthrie (R-Ky.), Chair of the House Energy and Commerce Committee, likewise explained that H.R. 1 "does not close the grants on any obligated funds." *Id.* at 245:5999.

61. The Budget Committee's Report on H.R. 1 stated that H.R. 1 "would decrease the federal deficit by approximately $104,934 as a result of repealing authorizations and rescinding unobligated funds that were appropriated to the U.S. Environmental Protection Agency (EPA) under the Inflation Reduction Act." Rep. No. 119-106(I), 119th Cong., 1st Sess., at 556 (May 20, 2025), https://rules.house.gov/committee-report/h-rept-119-106. The small amount of deficit

reduction envisioned further confirms that H.R. 1 did not rescind the $7 billion in funds already obligated for the entire Solar for All program.

62. In the same report, the minority members agreed that "[t]he budgetary significance of" H.R. 1's "repeal [of] section 134 of the Clean Air Act and resci[ssion] [of] unobligated funds for the Greenhouse Gas Reduction Fund" was "questionable as only $19 million is available out of the entire $27 billion appropriated. This remaining money is allocated for administrative purposes." *Id.* at 627.

63. After H.R. 1 was enacted, the CBO estimated that repealing the Greenhouse Gas Reduction Fund (Clean Air Act § 134) would reduce outlays by only about $19 million over Fiscal Year 2025 through Fiscal Year 2034, reflecting the repeal's effect on the Fund's remaining unobligated balances. *See CBO*, *Estimated Budgetary Effects of Public Law 119-21, to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Relative to CBO's January 2025 Baseline* (July 21, 2025), https://www.cbo.gov/publication/61570 (Excel spreadsheet) (select "view document" and select tab "Title VI." View row 21 and column O).

64. Upon information and belief, $19 million is approximately the remaining balance of the funds appropriated for EPA's administrative costs under 42 U.S.C. § 7434(a)(4).

65. H.R. 1 also did not eliminate EPA's entire administrative budget. In its FY 2025 request, EPA specifically requested funds within the Environmental Programs and Management ("EPM") account "to support implementation of the Greenhouse Gas Reduction Fund under the Inflation Reduction Act." *See* Env't Prot. Agency, *Fiscal Year 2025: Justification of Appropriation Estimates for the Committee on Appropriations*, Tab 05: Environmental Programs & Management at 40 (Mar. 2024), https://perma.cc/95WY-ASDY. On March 15, 2025, Congress passed a continuing resolution appropriating $3,195,028,000 in funding for "Environmental Protection

Agency—Environmental Programs and Management" in fiscal year 2025, which was not touched by H.R. 1. Full Year Continuing Appropriations and Extensions Act, Pub. L. No. 119-4, § 1802(3), 139 Stat. 9, 30 (2025).

**EPA unilaterally terminates Clean Energy Fund of Texas' Grant Agreement.**

66. Beginning in August of 2025—one month after H.R. 1 was enacted—EPA terminated Clean Energy Fund of Texas' Solar for All Grant Agreement. EPA did so by sending Clean Energy Fund of Texas a Termination Memorandum and another Assistance Amendment to its Solar for All Grant Agreement (hereinafter the "Termination Amendment"). A true and exact copy of the Termination Memorandum and the Termination Amendment is attached as Exhibits J and K, respectively.

67. In terminating Clean Energy Fund of Texas' Grant Agreement, EPA committed a clear and material breach of the Grant Agreements entered between EPA and Clean Energy Fund of Texas, which expressly limited the grounds for termination to three circumstances: (1) substantial noncompliance with the terms and conditions of the agreement that materially impairs performance, (2) adequate evidence of waste, fraud, or abuse, or (3) material misrepresentation of eligibility status. None of those conditions were satisfied here.

68. The rationale for EPA's termination was expressed in a Termination Memorandum to Clean Energy Fund of Texas, stating that it was terminating its Solar for All Grant Agreement. The Termination Memorandum asserted that EPA intended to terminate Clean Energy Fund of Texas' Grant Agreement based on EPA's interpretation of H.R. 1. *See* Ex. J at 1.

69. The Termination Memorandum stated that "pursuant to the One Big Beautiful Bill Act (OBBBA)," EPA was "hereby terminating [Clean Energy Fund of Texas'] Assistance Agreement." *Id.*

70. The Termination Memorandum further asserted:

> Section 60002 of OBBBA repeals the underlying authority for the Solar for All program at Section 134 of the Clean Air Act, 42 U.S.C. [§] 7434, and rescinds unobligated amounts to carry out Section 134. The repeal of the grant appropriations in CAA 134(a)(1)–(3), coupled with the rescission of the administrative appropriation in section 134(a)(4), effectively and completely terminated the statutory authority and all appropriations related to Solar for All. As both the grant appropriations and the EPA's administrative cost appropriation are rescinded, the Agency no longer possesses either the substantive legal authority or the financial appropriations needed to continue implementation, oversight or monitoring for waste, fraud, or abuse of these grants or of Solar for All. Thus, any attempt to continue the program's administration, in the absence of any authorizing legislation or appropriated funds for that purpose, is no longer legally permissible. The EPA has been weighing options for the future of the Solar for All program and has made the decision to terminate the SFA program and existing grants because the EPA no longer has a statutory basis or dedicated funding to continue administering and overseeing the nearly $7 billion outlay to approximately 60 grant recipients. Congress has made its intent clear—via a repeal of the statutory authorization and all appropriated funding for the program and the administrative burdens of implementing and overseeing the program—that the SFA program is no longer to operate.

*Id.*

71. EPA's interpretation of H.R. 1 is contrary to the statutory text, which states explicitly that only "the unobligated balances of amounts made available to carry out [Section 134 of the Clean Air Act] (as in effect on the day before the date of enactment of this Act) [were] rescinded." § 60002, 139 Stat. at 154. The legislative history of that provision further confirms that Congress rescinded only the approximately $19 million from the Greenhouse Gas Reduction Fund that had not yet been obligated and had been appropriated directly to EPA to support its costs in administering Greenhouse Gas Reduction Fund programs.

72. EPA's erroneous interpretation of H.R. 1 is the only justification EPA has provided to Clean Energy Fund of Texas for its decision to terminate the Clean Energy Fund of Texas' Grant Agreement.

73. In addition to the Termination Memoranda, EPA sent Clean Energy Fund of Texas a Termination Amendment to its Solar for All Grant Agreement.

74. The Termination Amendment states: "This amendment is to stop work; terminate the agreement; reduce performance period duration; curtail scope of work; and waive certain reporting requirements. Administrative terms and conditions are added." Ex. K at 1.

75. The Termination Amendment further states: "Per 2 CFR [§] 200.340 and the Termination General Terms and Conditions of this agreement, EPA is terminating this award. Your organization shall immediately stop work and take all reasonable steps to minimize the incurrence of costs otherwise allocable to the assistance agreement. See terms and conditions." *Id.*

76. The Termination Amendment further states: "The Agency is asserting its right under 2 CFR [§] 200.340 and the Termination General Term and Condition of this agreement to unilaterally terminate this award. This amendment serves as required notice under 2 CFR [§] 200.341." *Id.* at 4.

77. Under 2 C.F.R. § 200.340, a federal award "may be terminated in part or its entirety" in four circumstances: (1) by the federal agency if the recipient or subrecipient fails to comply with the terms and conditions of the award, (2) by all parties if they agree to terminate the award, (3) by the recipient or subrecipient upon sending notice of a reason to terminate the award, or (4) by the federal agency "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(1)–(4).

78. Section 200.340 also provides that a federal agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." *Id.* § 200.340(b). That is, unless the terms and conditions of the Federal award expressly

state that the award can be terminated based on a change in agency priorities, that is not a lawful ground for termination even where the Federal award makes reference to Section 200.340. *Id*.

79. The terms and conditions of each Federal award contain a termination provision that sets forth grounds for termination. The termination provision in the Amended Grant Agreement allows EPA "to terminate the Assistance Agreement only as specified in 2 CFR [§] 200.339 and the version of 2 CFR [§] 200.340 effective as of October 1, 2024, when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status." Ex. G at 36–37.

80. Therefore, the Grant Agreement clearly and unambiguously specifies only three bases for EPA's unilateral termination: (1) substantial noncompliance that materially impairs effective performance; (2) adequate evidence of waste, fraud, or abuse; or (3) material misrepresentation of eligibility status. *See id.* at 36–37.

81. EPA has never alleged (nor could it) that Clean Energy Fund of Texas is in substantial noncompliance with the terms and conditions of its Grant Agreement, that there is any evidence of waste, fraud, or abuse, or that Clean Energy Fund of Texas has materially misrepresented its eligibility status.

82. In terminating the Grant Agreement without satisfying the conditions provided in the termination clause, EPA therefore breached the Grant Agreement.

**Clean Energy Fund of Texas timely submitted an administrative dispute to EPA.**

83. EPA's Termination Memorandum and Termination Amendment, dated August 7 and August 8, 2025, respectively, provided different deadlines for Clean Energy Fund of Texas to challenge the termination. The Termination Memorandum directed Clean Energy Fund of Texas

to file a dispute "no later than 30 calendar days from the date this termination is electronically sent to you," meaning no later than September 6, 2025. Ex. J at 2. The Termination Amendment, on the other hand, directed that if Clean Energy Fund of Texas "disagrees with the terms and conditions specified in this award, the authorized representative of the recipient must furnish a notice of disagreement to EPA Award Official within 21 days after EPA award or amendment mailing date," meaning no later than August 29, 2025. Ex. K at 1.

84. On August 27, 2025, Clean Energy Fund of Texas timely submitted a dispute to EPA pursuant to 2 C.F.R. § 1500.15 and thereby challenged the termination of the Solar for All program and its individual Solar for All Grant Agreements. A true and exact copy of Clean Energy Fund of Texas' Formal Dispute is attached as Exhibit L.

85. On September 15, 2025, EPA acknowledged Clean Energy Fund of Texas' Formal Dispute via email. A true and exact copy of EPA's acknowledgment email to Clean Energy Fund of Texas is attached as Exhibit M.

86. Although Clean Energy Fund of Texas chose to submit an administrative dispute, neither its Grant Agreement nor applicable statutes or regulations require it to exhaust administrative remedies or otherwise obtain administrative decisions before an action in this Court.

87. Moreover, requiring Clean Energy Fund of Texas to continue pursuing its administrative claim before litigating their Tucker Act claims would be futile, inadequate, and result in irreparable injury. *See Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F. 2d 90, 105-07 (D.C. Cir. 1986).

88. On November 7, 2025, EPA replied to Clean Energy Fund of Texas's Formal Dispute, dismissing the request, explaining "[y]our Assistance Agreement was funded entirely by OBBBA-impacted funding" and "[a]s a result of termination, funds obligated to your Assistance

Agreement, less allowable pre-termination costs, termination costs, and close-out costs, became legally unobligated and subject to recession [sic]." A true and exact copy of EPA's Response to Clean Energy Fund of Texas's Formal Dispute is attached as Exhibit N.

**EPA begins the closeout process for Solar for All Grant Agreement.**

89. On or about October 1, 2025, EPA emailed Clean Energy Fund of Texas with information about Closeout Instructions for the Solar for All Program. A true and exact copy of the Closeout Instructions sent to Clean Energy Fund of Texas is attached as Exhibit O.

90. The Closeout Instructions provide that "[t]he award amendment immediately ended your award's performance period and put into effect the Closeout Agreement Programmatic Term and Condition." *Id.* at 1.

91. The Closeout Instructions further provide that "[m]oving forward, you are required to comply with this term and condition, the notice of termination, and the award amendment to close out your grant." *Id.*

92. The Closeout Instructions require that Clean Energy Fund of Texas submit a report to EPA "[w]ithin 120 calendar days of the end of the performance period (the date of termination that is listed in your award amendment)." *Id.*

93. The Closeout Instructions did not mention Clean Energy Fund of Texas' then-pending Disagreement or Formal Dispute with EPA.

94. Clean Energy Fund of Texas submitted a final financial report on December 5, 2025, under protest. Specifically, Clean Energy Fund of Texas explained, "[t]o ensure full compliance with all regulations and to preserve all available legal rights and remedies, and out of an abundance of caution and to avoid any suggestion that we do not remain in compliance, we are filing our final report and accompanying materials under protest and with reservation of rights."

Clean Energy Fund of Texas explained that it considered the closeout to be improper as the grant had been unlawfully and unilaterally terminated in direct contradiction of the terms and conditions of the grants as well as controlling law. A true and exact copy of the final financial report is attached as Exhibit P.

**EPA's actions harmed Clean Energy Fund of Texas.**

95. EPA has terminated Clean Energy Fund of Texas' Grant Agreement, ordered Clean Energy Fund of Texas to stop working, seized large sums of money from Clean Energy Fund of Texas' ASAP account, and frozen remaining balances in Clean Energy Fund of Texas' ASAP account, all causing harm to Clean Energy Fund of Texas.

96. Within days of terminating Clean Energy Fund of Texas' Grant Agreement, EPA withdrew from Clean Energy Fund of Texas' ASAP account approximately 92 percent of the money that had been awarded to Clean Energy Fund of Texas.

97. EPA effectuated this withdrawal without providing prior notice, explanation, or contractual justification, and without identifying the legal basis for the specific amount seized.

98. EPA seized Clean Energy Fund of Texas' grant money without notice, without reasoning, and without explanation for the amount of money taken.

99. EPA restricted Clean Energy Fund of Texas' use of the remaining grant money in their ASAP account to "allowable" costs for financial obligations incurred prior to the termination date, or for "reasonable and necessary termination costs." Ex. K at 4.

100. EPA's termination of the Grant Agreement and subsequent actions caused immediate and substantial compensable harm to Clean Energy Fund of Texas. EPA's actions—including terminating Clean Energy Fund of Texas' Grant Agreement and ordering Clean Energy

Fund of Texas to stop work— harm Clean Energy Fund of Texas even beyond the loss of the funds awarded in the Grant Agreement.

101. Clean Energy Fund of Texas' program—funded through its $156,120,000 award and incorporated into the Grant Agreement through the December 19, 2024, Assistance Amendment—was structured to deploy residential solar, community-serving solar, associated storage, and enabling-upgrade financial assistance to low-income and disadvantaged communities throughout the American south and southeast.

102. By directing Clean Energy Fund of Texas to stop work, freezing remaining funds, and withdrawing approximately 92% of Clean Energy Fund of Texas' obligated award, EPA has made it impossible for Clean Energy Fund of Texas to launch its planned rooftop-solar and community-solar financing activities, provide technical-assistance and project-deployment services, or deliver the energy-cost savings, resilience benefits, equitable-workforce development opportunities, and other community benefits that the Solar for All program was established to achieve.

103. Absent Defendant's breach, Clean Energy Fund of Texas would have had full access to and use of these funds to complete the project work described in the Grant Agreement and workplan over the five-year project period. At a minimum, Clean Energy Fund of Texas is entitled to recover damages for the total amount of the grant award, less funds previously distributed, in order to place Plaintiff in the position it would have occupied absent Defendant's unlawful termination.

104. Clean Energy Fund of Texas expected that its work would yield financial benefits beyond the Solar for All project period. For example, Clean Energy Fund of Texas' Solar for All programming was designed to "expand clean energy programs" and "promot[e] long-term

sustainability and growth in the clean energy sector," which would be funded by over $6 million in program income that Clean Energy Fund of Texas anticipated would return to the program as a result of Solar for All work, financing a revolving loan fund. Ex. F at 7. Further, the Solar for All investments were designed to transform the solar and clean energy markets by breaking down barriers to solar implementation and creating long-term market opportunities for Clean Energy Fund of Texas' financial products. *See, e.g.*, *id.* at 12 ("[T]hese groundbreaking community solar programs are poised to transform the solar landscape in states with unfavorable policy contexts, paving the way for additional projects through proof-of-concept, replicable models, and policy change."); *see also* Ex. B at 5 (describing how Solar for All was designed to "catalyze transformation in markets serving low-income and disadvantaged communities").

105. Defendant's unlawful actions have also damaged Clean Energy Fund of Texas by impairing its mission and depriving it of the means of assisting communities across the American South by meeting the environmental and economic challenges they face and otherwise advancing the well-being of the communities.

106. Clean Energy Fund of Texas has suffered additional compensable harm due to the sudden and unanticipated disruption to its operations and the resulting need to redeploy its personnel and resources and to terminate services, both in the short term and for the duration of the project period, as well as other specific and compensable consequences of the terminated grant.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of the Solar for All Grant Agreement

107. Clean Energy Fund of Texas incorporates by reference the allegations contained in the preceding paragraphs.

108. To recover for breach of contract, Clean Energy Fund of Texas must establish four elements: "(1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach." *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).

109. The Solar for All Grant Agreement is a binding contract that contemplates money damages.

110. The Solar for All Grant Agreement was entered into by EPA officials with authority to bind the United States.

111. EPA breached the express terms of Clean Energy Fund of Texas' Grant Agreement by wrongfully terminating the Grant Agreement.

112. The Solar for All Grant Agreement contained a provision by which EPA agreed to make a specified amount of federal funds available to Clean Energy Fund of Texas for its Solar for All project, creating a concrete disbursement obligation that EPA breached.

113. In the Amended Grant Agreement, EPA and Clean Energy Fund of Texas mutually agreed to limit EPA's unilateral termination rights under 2 C.F.R. § 200.339 and § 200.340 to situations involving substantial noncompliance that materially impairs performance, adequate evidence of waste, fraud, or abuse, or a misrepresentation of eligibility status.

114. Specifically, the termination provisions in Clean Energy Fund of Texas' Amended Grant Agreement provide as follows:

> EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR [§] 200.339 and the version of 2 CFR [§] 200.340 effective as of October 1, 2024, *when the noncompliance with the terms and conditions is substantial such that effective performance of the Assistance Agreement is Materially Impaired or there is adequate evidence of Waste, Fraud, or Abuse, or material misrepresentation of eligibility status*, prompting adverse action by EPA per 2 CFR [§] 200.339, through either a partial or full termination.

*See, e.g.,* Ex. G at 36–37 (emphasis added).

115. The bases for EPA's termination of Clean Energy Fund of Texas' Grant Agreement did not include substantial noncompliance that materially impaired performance, evidence of waste, fraud, or abuse, or a material misrepresentation of eligibility status.

116. The termination provisions in the Grant Agreement did not allow EPA to issue unilateral termination on any other grounds. Accordingly, the United States is liable for breach of the agreement.

117. EPA's breach of Clean Energy Fund of Texas' Solar for All Grant Agreement has caused Clean Energy Fund of Texas to suffer damages in an amount to be determined at trial.

**COUNT II**
**Breach of the Duty of Good Faith and Fair Dealing**

118. Clean Energy Fund of Texas incorporates by reference the allegations contained in the preceding paragraphs.

119. "Every contract, including one with the federal government, imposes upon each party an implied duty of good faith and fair dealing in its performance and enforcement." *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019) (citing *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014)) (other citations omitted).

120. The implied duty of good faith and fair dealing "includes 'the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of

the other party regarding the fruits of the contract.'" *Id.* (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

121. The Solar for All Grant Agreement is a binding contract that contemplates money damages.

122. The Solar for All Grant Agreement was entered into by EPA officials with authority to bind the United States.

123. The Solar for All Grant Agreement contained a provision by which EPA agreed to make a specified amount of federal funds available to Clean Energy Fund of Texas for its Solar for All project.

124. Clean Energy Fund of Texas entered into the Grant Agreement with EPA with the reasonable expectation that EPA would comply with the terms of the Grant Agreements and that EPA would act in good faith and deal fairly with Clean Energy Fund of Texas.

125. EPA did not comply with the terms of Clean Energy Fund of Texas' Grant Agreement. EPA breached the Grant Agreement's implied duty of good faith and fair dealing. This breach was independent of and in addition to EPA's wrongful termination because EPA engaged in conduct that frustrated Clean Energy Fund of Texas' performance and deprived it of the benefits of the Agreement even before and separate from the issuance of the termination notice.

126. EPA breached this implied duty by, among other things, targeting Clean Energy Fund of Texas' Grant Agreement for unilateral termination based on an erroneous and bad faith interpretation of H.R. 1, directing Clean Energy Fund of Texas to stop work under the Grant Agreement, withdrawing funds already awarded to Clean Energy Fund of Texas (without prior notice or explanation), preventing Clean Energy Fund of Texas from spending money already awarded to them, and imposing new terms and conditions on Clean Energy Fund of Texas.

127. EPA's actions interfered with Clean Energy Fund of Texas' performance under the Grant Agreement and destroyed Clean Energy Fund of Texas' reasonable expectations regarding the fruits of its Grant Agreement. EPA's conduct constituted an abuse of the discretion the Agreement afforded and frustrated the Grant Agreement's intended allocation of rights and benefits.

128. Upon information and belief, EPA's actions were intended to interfere with Clean Energy Fund of Texas' operation of the Solar for All program despite lacking any legal authority to do so. EPA's directives to halt performance, withdrawal of previously awarded funds, and imposition of extra-contractual conditions collectively evidence improper purpose inconsistent with the implied covenant.

129. EPA's actions caused Clean Energy Fund of Texas to suffer damages in an amount to be determined at trial.

**COUNT III**
**Illegal Exaction**

130. Clean Energy Fund of Texas incorporates by reference the allegations contained in the preceding paragraphs.

131. The Due Process Clause of the Fifth Amendment of the United States Constitution bars the government from appropriating "property[] without due process of law." U.S. Const. amend. V.

132. An illegal exaction occurs when a plaintiff "seeks return of all or part of that sum that was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute or a regulation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996) (internal citation and quotation omitted) (emphasis supplied). Simply put, an illegal exaction is when "the government has the citizen's money in its pocket." *Nat'l Veterans Legal Servs.*

*Program v. United States*, 968 F.3d 1340, 1348 (Fed. Cir. 2020) (internal citation and quotation omitted).

133. On July 17, 2024, EPA awarded Clean Energy Fund of Texas a $156,120,000 Solar for All Grant Agreement in furtherance of Section 134 of the Clean Air Act. EPA thereafter deposited the full grant amount, less in-kind funds reserved for EPA, into Clean Energy Fund of Texas's ASAP account, for Clean Energy Fund of Texas's use in accordance with the Grant Agreement, the EPA-approved workplan, and the Solar for All program.

134. Since July 17, 2024, Clean Energy Fund of Texas had a property interest in the monies EPA provided pursuant to Clean Energy Fund of Texas's Grant Agreement, including the right to withdraw and use the funds in accordance with the Grant Agreement, the EPA-approved workplan, and the Solar for All program.

135. The July 2025 passage of H.R. 1 rescinded only "the unobligated balances of amounts made available to carry out" Section 134 of the Clean Air Act. Pub. L. 119-21, § 60002 139 Stat. 72, 154 (July 4, 2025). Because the grant funding awarded to Clean Energy Fund of Texas had already been obligated, H.R.1 did not authorize EPA to terminate Clean Energy Fund of Texas's Grant Agreement, rescind Clean Energy Fund of Texas's awarded funds, withdraw funds from Clean Energy Fund of Texas's ASAP account, or restrict Clean Energy Fund of Texas's use of those funds.

136. EPA disregarded H.R.1's unambiguous language and illegally exacted Clean Energy Fund of Texas's monies from its designated ASAP account.

137. When EPA withdrew $143,536,915.02 from Clean Energy Fund of Texas's designated ASAP account and restricted Clean Energy Fund of Texas's access to and use of the remaining funds, EPA exceeded its statutory and regulatory authority under Section 134 of the

Clean Air Act, H.R.1, and applicable federal grant regulations. Thus, EPA has illegally exacted funds from Clean Energy Fund of Texas's and has deprived Clean Energy Fund of Texas's of its property without due process of law in violation of the Due Process Clause of the Fifth Amendment.

138. Clean Energy Fund of Texas is entitled to payment of the monies illegally exacted from Clean Energy Fund of Texas's designated ASAP account, including the amounts withdrawn, restricted, withheld, or otherwise made unavailable by EPA, in violation of Section 134 of the Clean Air Act, H.R. 1, and the Due Process Clause.

**COUNT IV**
**Unconstitutional Taking**
***In the alternative***

139. Clean Energy Fund of Texas incorporates by reference the allegations contained in the preceding paragraphs.

140. Clean Energy Fund of Texas's primary position is that EPA's termination of the Grant Agreement, withdrawal of funds from Clean Energy Fund of Texas's ASAP account, and restriction of Clean Energy Fund of Texas's access to and use of those funds breached the Grant Agreement and the implied duty of good faith and fair dealing. Clean Energy Fund of Texas's further alleges that EPA's withdrawal and restriction of funds constituted an illegal exaction. However, if the Court finds that Clean Energy Fund of Texas's is not entitled to relief under these theories, Clean Energy Fund of Texas's pleads this takings claim in the alternative.

141. The Takings Clause of the Fifth Amendment provides that no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend. V. The Fifth Amendment protects property owners from, and requires just compensation for, physical takings, whether permanent or temporary.

142. Clean Energy Fund of Texas has a valid, protected, and legally cognizable property interest and property right in the funds awarded, obligated, and made available to Clean Energy Fund of Texas through its ASAP account, including Clean Energy Fund of Texas's right to access and use those funds in accordance with the Grant Agreement and EPA-approved workplan.

143. The Government, acting through EPA, withdrew approximately $143,536,915.02 from Clean Energy Fund of Texas's ASAP account, and has denied Clean Energy Fund of Texas access to, and use of, the remaining funds for more than a year.

144. EPA's withdrawal and restriction of Clean Energy Fund of Texas's funds deprived Clean Energy Fund of Texas of its protected property interests in those funds and in its right to access and use those funds for the purposes authorized by the Grant Agreement and EPA-approved workplan.

145. To the extent EPA's actions are not remedied as a breach of contract or illegal exaction, EPA's withdrawal and restriction of Clean Energy Fund of Texas's funds constituted a taking of Clean Energy Fund of Texas's private property for public use in violation of the Fifth Amendment. *Darby Dev. Co., Inc. v. United States*, 112 F.4th 1017, 1024 (Fed. Cir. 2024).

146. The U.S. Constitution requires just compensation for the taking.

147. EPA has not provided just compensation for the taking of Clean Energy Fund of Texas's property and property rights, and thus the government has violated the Fifth Amendment's Taking Clause.

148. Clean Energy Fund of Texas is entitled to full and just compensation for the government's taking of its property and property rights.

149. As a result of EPA's actions, Clean Energy Fund of Texas is entitled to all relief available under law, including just compensation, costs, and such other relief as the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Clean Energy Fund of Texas prays that this Court enter judgment against the United States as follows:

i. Awarding money damages to Clean Energy Fund of Texas in an amount to be determined at trial;

i. Awarding monetary relief to Clean Energy Fund of Texas for EPA's illegal exaction of funds from Clean Energy Fund of Texas's ASAP account in an amount to be determined at trial;

ii. In the alternative, awarding just compensation to Clean Energy Fund of Texas for EPA's unconstitutional taking of Clean Energy Fund of Texas' property and property rights in an amount to be determined at trial;

iii. Award any allowable pre- and post-judgment interest;

iv. Awarding Clean Energy Fund of Texas its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

v. Granting other such relief as this Court may deem proper.

Dated: September 14, 2026

Respectfully Submitted,

By:/s/Jennifer Whitfield

Jennifer Whitfield
Southern Environmental Law Center
10 10th Street NE, Suite 1050
Atlanta, GA 30309
Telephone: (404) 521-9900
Facsimile: (404) 521-9909
jwhitfield@selc.org

*Counsel of Record for Plaintiff Clean Energy Fund of Texas*

Kym Meyer
Nick Torrey
Southern Environmental Law Center
136 E Rosemary St., Suite 500
Chapel Hill, NC 27514
Telephone: (919) 967-1540
Facsimile: (919) 929-9421
kmeyer@selc.org
ntorrey@selc.org

*Of Counsel:*

By: /s/ Gary DiBianco

Gary DiBianco
Lawyers for Good Government
1319 F St NW Ste 301, PMB 181
Washington, DC 20004
(404) 913-5529
gary@lawyersforgoodgovernment.org
*Co-Counsel for Plaintiff Clean Energy Fund of Texas*